# W. WILLIAM KOENNICKE *v.* CURT A. MAIORANO
## (14167)

Dupont, C. J., and Landau and Healey, Js.

Argued February 28—officially released September 10, 1996

*Martin B. Burke*, for the appellant-appellee (defendant).

*Howard B. Schiller*, for the appellee-appellant (plaintiff).

HEALEY, J. The plaintiff, W. William Koennicke, instituted this action in a complaint in four counts against the defendant, Curt A. Maiorano, seeking to quiet title to a disputed portion of land that runs along the boundary between his property and that of the defendant in the town of Hampton. Generally speaking, their properties adjoin each other. The plaintiff also seeks damages for the cutting of trees and for trespass and title by adverse possession.[1]

The first count, which seeks to quiet title, alleges that the defendant claims an estate or interest by deed in "an undefined portion" of the land of the plaintiff on which the defendant has knowingly entered without the plaintiff's permission, has cut down trees without permission, has caused earth moving equipment to be brought in, has caused disturbance to the earth thereon, has removed signs prohibiting trespass on the plaintiff's land and has stored cut wood on that land. The second count incorporates a number of the same allegations and further alleges that the defendant's actions constitute a cutting of trees on the land of another in violation of General Statutes § 52-560.[2] The third count incorpo-

---

[1] The fourth count, which alleges a cause of action in adverse possession, is not involved in this appeal.

[2] General Statutes § 52-560, which is entitled "Damages for cutting trees, timber or shrubbery," provides: "Any person who cuts, destroys or carries away any trees, timber or shrubbery, standing or lying on the land of another or on public land, without license of the owner, and any person who aids therein, shall pay to the party injured five times the reasonable value of any

rates the same allegations as the second count and sets out two additional allegations. They are that, on diverse dates, the plaintiff or his agents personally communicated to the defendant orders not to enter the plaintiff's property or to leave that property and that the defendant's conduct constituted criminal trespass in violation of General Statutes § 53a-107.[3]

The case was referred to an attorney trial referee who heard the evidence[4] and submitted her report comprising her findings of fact and conclusions of law. At the same time, she also filed her memorandum of decision,[5] which included case law citations as well as her recommendations for judgment. In it, she found the issues for the plaintiff on the first, second and third counts and recommended judgment for the plaintiff on those three counts, and she found the issues for the defendant on the fourth count and recommended judgment for the defendant on that count. The defendant objected[6] to the acceptance of the report of the attorney

tree intended for sale or use as a Christmas tree and three times the reasonable value of any other tree, timber or shrubbery; but, when the court is satisfied that the defendant was guilty through mistake and believed that the tree, timber or shrubbery was growing on his land, or on the land of the person for whom he cut the tree, timber or shrubbery, it shall render judgment for no more than its reasonable value."

[3] General Statutes § 53a-107, which is entitled "Criminal trespass in the first degree: Class A misdemeanor," provides: "(a) A person is guilty of criminal trespass in the first degree when: (1) Knowing that he is not licensed or privileged to do so, he enters or remains in a building or any other premises after an order to leave or not to enter personally communicated to him by the owner of the premises or other authorized person; or (2) he enters or remains in a building or any other premises in violation of a restraining order issued pursuant to section 46b-15 or a protective order issued pursuant to section 46b-38c by the superior court.

"(b) Criminal trespass in the first degree is a class A misdemeanor."

[4] The attorney trial referee also viewed the land involved.

[5] One commentator has noted that the report to be filed with the trial court under Practice Book § 434 "may, but need not, include a memorandum of decision." W. Moller & W. Horton, 1 Connecticut Practice, Practice Book Annotated, p. 635.

[6] The defendant's "Objection to Acceptance of Report" set out the following: "(1) The report finds as a fact a boundary line which disregards the

trial referee. The trial court overruled the objections of the defendant and adopted the referee's memorandum of decision except for the award of common law punitive damages in the third count. It rendered judgment in favor of the plaintiff on the first count, establishing title to the disputed premises by deed; for the plaintiff on the second count for $12,000; and for the plaintiff on the third count, to the effect that a trespass had been committed by the defendant. This appeal followed. The plaintiff cross appealed on matters involving damages, which we consider later in this opinion.

On this appeal, the defendant claims that the trial court improperly concluded (1) that, as a matter of law, the division line between the properties of the plaintiff and defendant was a stone wall, (2) that, as a matter of fact, a stone wall constituted the boundary line between the two properties involved when that finding was not supported by the evidence, (3) that the defendant removed stones that the plaintiff had placed to mark the boundary line between them when inconsistently finding that the stone wall was the boundary between the parties, (4) that, as a matter of law, the defendant wrongfully cut trees on the land of the plaintiff in violation of § 52-560 and (5) that the defendant committed a criminal trespass in violation of General Statutes § 53a-107. We discuss the first three claims together and the fourth and fifth together. We affirm the judgment of the trial court except as to the third count of the complaint.

The plaintiff filed a cross appeal in which he claims that the trial court improperly refused to award heightened damages, refused to award attorney's fees based

acreage called for in the deed, which was made an exhibit at trial. Exhibit 'C.' *Nichols* v. *Turney*, 15 Conn. 101, 108 [1842]. (2) Although the Referee found that the deed was ambiguous (Paragraph 9) she based other findings upon a portion of the admittedly ambiguous description, while ignoring other portions of said deed description. (3) The Memorandum of Decision incorrectly applies the law to the facts found."

on its own knowledge of the complexity of the proceedings before it and failed to order a separate hearing regarding attorney's fees if the award of heightened damages was properly rejected. The issues of the cross appeal are interrelated, and relate closely to the resolution of the appeal itself.

The report of the attorney trial referee discloses that she found, inter alia, the following facts and made certain conclusions of law. The plaintiff[7] and the defendant[8] own adjoining parcels of land in the town of Hampton

[7] The plaintiff's parcel, which is on the east side of Brook Road, extending south from Clarks Corner to the town of Scotland, was acquired by him by a deed from Richard Koennicke, dated February 6, 1960, and it is described as follows: "All that certain piece or parcel of land situated in the southwesterly part of the Town of Hampton, County of Windham and State of Connecticut, on the easterly side of the Brook Road, so called, leading southerly from Clarks Corners to the Town of Scotland and bounded and described as follows: Beginning at the northwesterly corner of the within described tract at the junction of land now or formerly of Eugene A. Roure, formerly the D. M. Deming place, and the easterly side of the said Brook Road, thence the line runs easterly along a stone wall by land now or formerly of Eugene A. Roure, to a corner of walls; thence the line runs northerly along the wall, bounded westerly by land now or formerly of Eugene A. Roure to a corner of walls and by land now or formerly of Elizabeth Koennicke Maiorano, thence the line runs easterly along the wall and land now or formerly of Elizabeth Koennicke Maiorano to a corner of walls and to land of persons unknown, thence the line runs southerly by a wall and land of persons unknown to a corner of walls; thence the line runs easterly along a wall to a corner of walls and land of persons unknown; thence the line runs southerly along a wall to a corner of walls and land of persons unknown; thence the line runs westerly to Brook Road along a wall and land now or formerly of Philitus Farnham, Dwight Carey and others; thence the line runs northerly along the easterly side of Brook Road to the point or place of beginning, containing 115 acres, more or less."

[8] The defendant's parcel came to him through a certificate of devise in 1981 and it is described as follows: "A certain piece or parcel of land with the buildings thereon, situated in the southwesterly part of the Town of Hampton, County of Windham and State of Connecticut bounded and described as follows: bounded north by land now or formerly of Mr. Neff, Allen Jewett, William and Marina Bennett and others; easterly by land now or formerly of said Allen Jewett, Bennett, Darias Shippe, land belonging to the Peter Fetherstone estate and others; southerly by land formerly of Philitus Farnham, Dwight Carey and other; west by the highway leading from the

formerly owned by the defendant's mother, Elizabeth Koennicke Maiorano (Elizabeth). The plaintiff is Elizabeth's brother. Elizabeth had obtained title to the entire property in 1943 by a warranty deed from Richard Koennicke. That warranty deed included the recital that the entire property "contains about two hundred and twenty five acres, be the same more or less." Thereafter, in 1953, because she was unable to repay Richard Koennicke fully for the property, Elizabeth reconveyed the south portion of it to him in satisfaction of that debt. The warranty deed reconveying this portion to her grantor, Richard Koennicke, included the recital "roughly estimated as containing 115 acres of land, be it the same, more or less." The attorney trial referee found that the statement of acreage in this deed was merely a matter of description and was not intended to assure a particular quantity of land. In addition, the 1953 warranty deed described the lands reconveyed to Richard Koennicke by reference to stone walls and adjoining property owners. The division line between the properties was a stone wall dividing two fields. The larger field lay to the north of the stone wall and was retained by Elizabeth.

The plaintiff acquired title to the land owned by Richard Koennicke by a warranty deed dated February 6, 1960. That deed repeated the description that was set out in the 1953 warranty deed from Elizabeth to Richard Koennicke.

The defendant acquired his present interest in this parcel, which was the balance of the land retained by Elizabeth, after her 1953 deed to Richard Koennicke, by virtue of a November 13, 1963 quitclaim deed from Elizabeth to herself and the defendant with rights of survivorship. The description set out in the 1963 quit-

house formerly of D. M. Deming to Scotland; also west by land now or formerly of said Deming, land formerly of Mr. Hyde and land of said Shippe and other. Excepting parcel conveyed to Richard Koennicke in Volume W Page 123 on May 13, 1953."

claim deed was essentially the original description used in the 1953 warranty deed from Richard Koennicke to Elizabeth, including the "containing 225 acres more or less" language. This 1963 quitclaim deed contained the following recital: "Excepting and excluding from the above a parcel conveyed by [Elizabeth] to Richard Koennicke by Warranty Deed, dated May 13, 1953 . . . and which parcel contains 115 acres, more or less."

The disputed area that is the subject of this action is a strip of approximately 300 feet extending from the stone wall south and includes the smaller of the two fields. The description in the 1953 warranty deed from Elizabeth to Richard Koennicke is ambiguous because of the fact that it contains some references[9] to monuments that no longer exist. The attorney trial referee found that it was the intention of Elizabeth to convey, by that 1953 deed, all the land to the south of the stone wall between the two fields to Richard Koennicke. Prior to the 1953 deed to her uncle, Richard Koennicke, Elizabeth had identified the stone wall between the fields as the boundary to Kurt A. Koennicke, her brother, and she had indicated to him that if he did not buy it, she was going to reconvey it to Richard Koennicke to satisfy her debt to him. Prior to his purchase of his parcel from Richard Koennicke, the plaintiff walked the boundary line with Richard, who indicated that he was conveying to the plaintiff the land to the south of the stone walls dividing the two fields. After the plaintiff's purchase of this land, Elizabeth, when conferring with the plaintiff to issue deer permits and again when the plaintiff allowed a neighboring farmer to plant the field, acknowledged the stone wall dividing the larger field and smaller field as the boundary line between her property and that of the plaintiff. Since acquiring title, the plaintiff has planted rye in the smaller field to the

---

[9] This concerns the circumstance that not all of the stone wall or walls referred to in the deed are now in existence.

south of the stone wall and has also cut wood to the south of the stone wall. Elizabeth did not utilize the land south of the stone wall after its purchase by the plaintiff, digging test pits only on the north portion in search of gravel to sell. There were no disputes between the plaintiff and Elizabeth or the defendant prior to Elizabeth's death.

The dispute concerning the location of the boundary line did not start until approximately 1985, when the defendant moved to the farm on his property. In approximately 1979, the plaintiff had loaned the defendant $7500, which was not repaid. The plaintiff, in 1986 or 1987, asked the defendant to repay that $7500 loan. The disputes over the plaintiff's ownership coincided with these requests for repayment.

In June, 1980, the defendant entered into a contract with the Rossi corporation to log his land, which was estimated at that time to be 100 acres. The contract called for logging only to the north of the stone wall between the fields. At the time of his contract with Rossi, the defendant placed his land in forestry classification, referencing his total acreage as 100 acres. In addition, he has paid taxes on 100 acres at least since that time. With the stone wall between the two fields as the boundary, the defendant's land is about 100 acres.

The defendant began entering the disputed portion, that is the land south of the stone wall, to cut trees and to store junk vehicles in 1986 or 1987. Sometime within the last five years, the defendant made a road from the small field to a pond on the plaintiff's property. The defendant removed stones that the plaintiff placed to mark the boundary line. Since November 15, 1988, the defendant has cut approximately 100 trees, oak, maple and poplar. The value of these 100 trees is $4000. The defendant threatened to assault the plaintiff when encountering him in the disputed area. The defendant

was aware that the plaintiff was claiming the disputed area as his since 1963 and took no action to dispute that claim.

The boundary line between the property of the plaintiff and the defendant is the dashed line depicted by Stephen A. Filip[10] on his boundary survey, which is in evidence as plaintiff's exhibit G.

## I

We first address the defendant's claims that the trial court improperly adopted the attorney trial referee's finding that the stone wall was the boundary between the two properties at issue and that its findings in doing so were inconsistent. Certain applicable principles, that will be supplemented as occasion requires, are appropriately set out at this point. All actions to determine record title of any interest in real property are governed by General Statutes § 47-31. *DeVita* v. *Esposito*, 13 Conn. App. 101, 104, 535 A.2d 364 (1987), cert. denied, 207 Conn. 807, 540 A.2d 375 (1988). The statute requires that the complaint in such an action describe the property in question, state the plaintiff's claim, interest or title and the manner in which the plaintiff acquired the interest, title or claim, and it must also name the person or persons who may claim the adverse interest or estate. General Statutes § 47-31. The burden of proof in this case is on the plaintiff to prove that the boundary is where he claims it to be. *Steinman* v. *Maier*, 179 Conn. 574, 575, 427 A.2d 828 (1980); *Simmons* v. *Addis*, 141 Conn. 738, 741, 110 A.2d 457 (1954). The plaintiff is required to prevail on the strength of his title and not on the weakness of his adversary's claim. *Velsmid* v. *Nelson*, 175 Conn. 221, 229, 397 A.2d 113 (1978); *Lake Garda Improvement Assn.* v. *Battistoni*, 155 Conn. 287,

---

[10] Stephen A. Filip was a land surveyor retained by the plaintiff, who drew a boundary map based on his investigation and who also testified as an expert at the trial of this action.

293, 231 A.2d 276 (1967); *Burke* v. *Ruggerio*, 24 Conn. App. 700, 704, 591 A.2d 453, cert. denied, 220 Conn. 903, 593 A.2d 967 (1991).

"In determining a boundary line in a deed, the law is clear that the description in the deed, if clear and unambiguous, must be given effect. In such a case, there is no room for construction. The inquiry is not the intent of the parties but the intent which is expressed in the deed. *Lake Garda Improvement Assn.* v. *Battistoni*, 160 Conn. 503, 511, 280 A.2d 877 [1968]; *Faiola* v. *Faiola*, 156 Conn. 12, 17, 238 A.2d 405 [1966]; *Katsoff* v. *Lucertini*, 141 Conn. 74, 77, 103 A.2d 812 [1954]; *Patzloff* v. *Kasperovich*, 116 Conn. 440, 441–42, 165 A. 349 [1933]; *Botsford* v. *Wallace*, 69 Conn. 263, 271, 37 A. 902 [1899]. Where the deed is ambiguous, however, the intention of the parties is a decisive question of fact. *Lake Garda Improvement Assn.* v. *Battistoni*, supra [511]; *Staff* v. *Hawkins*, 135 Conn. 316, 319, 64 A.2d 176 [1949]; *Gioia* v. *Annunziata*, 102 Conn. 52, 56, 127 A. 921 [1925]; *Raymond* v. *Nash*, 57 Conn. 447, 452, 18 A. 714 [1889]." *F. & AK, Inc.* v. *Sleeper*, 161 Conn. 505, 510, 289 A.2d 905 (1971); see *Apostles of the Sacred Heart* v. *Curott*, 187 Conn. 591, 595, 448 A.2d 157 (1982); *Faiola* v. *Faiola*, supra, 18. In ascertaining the intention of the parties, it was proper for the trial court to consider the surrounding circumstances. *Staff* v. *Hawkins*, supra, 319; *Connecticut Light & Power Co.* v. *Fleetwood*, 124 Conn. 386, 389, 200 A. 334 (1938).

It is well settled as a rule of the construction of deeds that "[w]here the boundaries of land are described by known and fixed monuments which are definite and certain, the monuments will prevail over courses and distances." *Frank Towers Corp.* v. *Laviana*, 140 Conn. 45, 50, 97 A.2d 567 (1953); *Velsmid* v. *Nelson*, 175 Conn. 221, 227, 397 A.2d 113 (1978); *Russo* v. *Corideo*, 102 Conn. 663, 672, 129 A. 849 (1925). The general rule is that the designated quantity of land called for, here

acreage, is the least reliable aspect of the description in determining the intent by the parties. See *Texas Eastern Transmission Co.* v. *McCrate*, 76 Ill. App. 3d 828, 395 N.E.2d 624 (1979); *Erickson* v. *Wick*, 22 Wash. App. 433, 591 P.2d 804 (1979); J. Backman & D. Thomas, A Practical Guide to Disputes Between Adjoining Landowners—Easements (1990) § 8.02; 12 Am. Jur. 2d, Boundaries § 75. The land of an adjoining owner whose boundaries can be fixed by known monuments is also considered to be a monument to establish a boundary. *Frank Towers Corp.* v. *Laviana,* supra, 51.

A "monument," when used in describing land, has been defined as "any physical object on the ground which helps to establish the location of the line called for and the term 'monument,' when used with reference to boundaries, indicates a permanent object which may be either a natural or artificial one. . . . Natural monuments include such natural objects as mountains, streams, rivers, creeks, springs, trees . . . . Artificial objects and monuments consist of marked lines, stakes, rocks, fences, buildings and similar matters marked or placed on the ground by the hand of man." 12 Am. Jur. 2d, Boundaries § 4, p. 549; 4 H. Tiffany, Real Property (3d Ed. 1975) § 993, p. 193; 3 American Law of Property, (Casner Ed. 1952) § 12.105; see *Delphey* v. *Savage*, 227 Md. 373, 374–75, 177 A.2d 249 (1962). It has been said that "a stone wall is strong evidence of a boundary line. *Roberti* v. *Atwater*, 43 Conn. 540, 546 [1876]"; *Pendleton* v. *MacDonald*, 6 Conn. Sup. 5, 7 (1938); see *Wallingford Rod & Gun Club, Inc.* v. *Nearing*, 19 Conn. Sup. 414, 417, 116 A.2d 517 (1955). One court has said that a monument, when used in describing land, is "any physical object on the ground which helps to establish the location of the line called for," whether it be natural or artificial. *Delphey* v. *Savage*, supra, 378. That court noted that, just as in contracts or wills, the intention of the parties governs the interpretation of deeds and

that it is for that reason "that monuments named in deeds are given precedence over courses and distances, because the parties can see the tree, stone, stake, pipe or whatever it may be, which is referred to in the deed, but would require equipment and expect assistance to find a course and distance." Id. "[T]he physical disappearance of a monument does not terminate its status as a boundary marker, provided that its former location can be ascertained through extrinsic evidence." *Bailey* v. *Look*, 432 A.2d 1271, 1274 (Me. 1981); see *Theriault* v. *Murray*, 588 A.2d 720, 722 (Me. 1991); *Seely* v. *Hand*, 119 N.H 303, 307, 402 A.2d 162 (1979); 6 G. Thompson, Real Property (1962) § 3042.

The Supreme Judicial Court of Massachusetts has said: "Any competent evidence may be considered in determining the true boundary line between adjoining owners." *Holmes* v. *Barrett*, 269 Mass. 497, 500, 169 N.E. 509 (1930). Among the evidence that may properly be considered in the determination of boundary disputes between private owners is evidence that involves an exception to the hearsay rule. There it has been said that: "A declaration as to boundaries between individual proprietors is hearsay, but it is one of the recognized exceptions to the hearsay rule whenever the legal conditions of its admission are present." *Turgeon* v. *Woodward*, 83 Conn. 537, 540, 78 A. 577 (1910). " 'The difficulty of proving private boundaries furnished the indispensable and urgent necessity for the admission of declarations of the deceased with respect to them. Many conveyances of agricultural land, and especially of woodland, do not describe the premises conveyed by courses and distances, nor even by fixed bounds. Lines cannot be run from them alone. When the private bounds are designated by landmarks, they are usually perishable in character and liable to soon disappear through decay and neglect, or in the further improve-

ment and settlement of the country, so that the next generation has either forgotten, or never knew, them, or cannot find them.' Id., 541." *Putnam, Coffin & Burr, Inc.* v. *Halpern,* 154 Conn. 507, 513, 227 A.2d 83 (1967). Our courts have acknowledged that "[t]he scope of the exception must reasonably be confined within the limits of the necessity from which it arose."[11] Id., 513. Accordingly, our courts stated: "Declarations as to the location of ancient boundaries are hearsay, and are not admissible in evidence unless it appears (1) that the declarant is dead, (2) that he would be qualified as a witness to testify if present, and especially that he had peculiar means of knowing the boundary, (3) that the statement was made before the controversy in suit arose, and (4) that he had no interest to misrepresent the truth in making the declaration. *Mentz* v. *Greenwich,* 118 Conn. 137, 144, 171 A. 10 [1934]; *Borden* v. *Westport,* 105 Conn. 139, 149, 134 A. 803 [1926]; *Turgeon* v. *Woodward,* [supra, 541]. . . ." (Internal quotation marks omitted.) *Wildwood Associates, Ltd.* v. *Esposito,* 211 Conn. 36, 44, 557 A.2d 1241 (1989), quoting *Putnam, Coffin & Burr, Inc.* v. *Halpern,* supra, 513; *Rompe* v. *King,* 185 Conn. 426, 428–29, 441 A.2d 114 (1981).

---

[11] The defendant argues that this exception to the hearsay rule is not favored. Years ago, our Supreme Court, in synthesizing earlier decisions on this exception, said in *Turgeon* v. *Woodward,* supra, 83 Conn. 540–41, that "[i]n some instances exceptions to this rule have grown up through necessity, from the knowledge that the only alternative is the practical abandonment of all attempt to prove certain kinds of facts unless the hearsay barrier is let down, and in the established and general knowledge that the great majority of human affairs are more or less affected by a reliance upon hearsay without imperilling their trustworthiness, or their efficiency and safety. Swift's Evidence, 121. *Murray* v. *Supreme Lodge,* 74 Conn. 715, 718, 52 Atl. 722 [1902], furnishes an example of an exception to the hearsay rule, based upon necessity. Necessity alone could not have secured these exceptions to the hearsay rule, unless courts had been able to see that, with the adoption of certain safeguards as conditions precedent to the reception of such evidence, reliance might be placed upon it as reasonably to be trusted. In such way the law uses, in many cases, the only available evidence, and the truth benefits by its use."

Each party produced an expert witness on this dispute.[12] There was strongly conflicting evidence and it became the function of the trier of fact to determine credibility and, in doing so, it could "believe all, some or none of the testimony" of either expert. *Dooley* v. *Leo*, 184 Conn. 583, 586, 440 A.2d 236 (1981); *Bond* v. *Benning*, 175 Conn. 308, 312–13, 398 A.2d 1158 (1978); see 12 Am. Jur. 2d, Boundaries § 102.

The *Turgeon* court set out the four requisites of the hearsay exception, which has enjoyed vitality to the present. Immediately before doing so, however, it took pains to state: " 'The law does not dispense with the sanction of an oath and the test of cross-examination as a prerequisite for the admission of verbal testimony, unless it discovers in the nature of the case some other sanction or test deemed equivalent for ascertaining the truth.' Loomis, J., in *South-West School District* v. *Williams*, 48 Conn. 504, 507 [1881]. Hence, in order to make such declaration equivalent in reliability and trustworthiness to the standard of ordinary testimony when subjected to cross-examination, certain conditions were attached to it as prerequisites to its admission." *Turgeon* v. *Woodward*, supra, 83 Conn. 541. Evidence that is properly admitted under this exception, as it was in the trial court, is competent evidence for the trier to consider and weigh with all the other evidence in the case.[13]

---

[12] The plaintiff's expert was Filip and the defendant's expert was Charles Normandin. Both were licensed land surveyors and each prepared a map showing where each determined the disputed boundary was located. Both maps became exhibits in the case.

[13] Upon our examination of the record before us, we note that in a number of instances the defendant contends that certain matters disclosed by the evidence are "facts" supporting his claims. It is apparent that a number of these claims involved issues of credibility and were resolved against him. Nothing, of course, " 'is more elementary than that the trier is the final judge of the credibility of witnesses and of the weight to be accorded their testimony.' " *Wildwood Associates, Ltd.* v. *Esposito*, supra, 211 Conn. 45. "We will not intrude upon this province unless the facts found are legally and logically inconsistent with the trial court's conclusion." Id.

Essentially, the defendant's claims here are, first, that the court's decision was incorrect, both as a matter of law and as a matter of fact, in finding that the division line between the property of the plaintiff and the defendant was a stone wall and, second, that the court improperly found that the defendant removed stones that the plaintiff had placed to mark the boundary between their properties, while inconsistently finding that the stone wall was the boundary between them. We do not agree.

Both parties agree that the 1953 deed from Elizabeth to Richard Koennicke was ambiguous. That deed, stated as "containing 115 acres, more or less," began its description of the property intended to be conveyed, as "[b]eginning at the northwesterly corner of the within described tract at the junction of land now or formerly of Eugene A. Roure, formerly the D. M. Deming place, and the easterly side of the said Brook Road . . . ." This deed then describes the property back to the point on the east side of Brook Road as running along walls.[14] In other words, although the deed refers to some named abutters, throughout its description it refers to running along walls from beginning to end. It is the east-west boundary between the parties that is in dispute. The plaintiff and the defendant are at counterpoint concerning the condition and nature of the stone wall that figures in the location of the east-west boundary. In his brief, the plaintiff maintains that "the parties agree that the property was not entirely surrounded by stone walls, as the literal description in the [ambiguous] deed indicated." This appears to be so. He also claims on the basis of the credible evidence and the applicable

[14] This deed refers to "a stone wall," "the wall," "a corner of walls," "along the wall" and "along a wall." We follow counsel, who at trial, treated this parcel as being enclosed by a stone wall in its entirety insofar as the description in this deed is concerned. We will dispose of the case on the theory on which is was tried and on which the trial court decided it. *Borzencki* v. *Estate of Stakum*, 195 Conn. 368, 375, 489 A.2d 341 (1985); *Crozier* v. *Zaboori*, 14 Conn. App. 457, 463, 541 A.2d 531 (1988).

law that certain barbed wire fencing described in the evidence constituted the western boundary with Roure, thus giving the attorney trial referee a "clear basis" to harmonize the ambiguity in the deed and to construe the calls for a stone wall as identifying the stone wall which traversed the two fields as the division line. This, he argues, is supported by the clear intention of Elizabeth as to what she intended to convey to Richard Koennicke in 1953 and what he fairly understood he was receiving. The plaintiff appears to concede that there may be a question on the initial call in the deed for a nonexistent stone wall "at the junction of land of Eugene A. Roure." He, however, argues that by reconciling the first call of this deed as being marked by barbed wire[15] rather than by a stone wall, and by construing this call for the Roure boundary as a monument, all the other monuments of the deed were thus harmonized and rendered consistent the remaining calls in the deed.

The defendant argues that the determination of the boundary line was made based on "fragmentary documentation" when it should have been based on acreage, as was the determination of his expert Charles Normandin. That expert relied on the acreage set out in the deed in question because, as he said, that deed did not give "detailed courses and distances." In addition, arguing that only "remnants" of a stone wall still exist in the disputed area, the defendant maintains that the use of them by the plaintiff's expert, Filip, to mark the plaintiff's northern boundary was improper. In addition,

---

[15] There was in evidence before the attorney trial referee as an exhibit and in the record before this court a video of the plaintiff as he traverses the boundary line involved in this case. A viewing of it is illuminating as to the condition and claimed location of the stone wall in question, barbed wire, barways, location of trees allegedly cut by the defendant as well as stones allegedly moved by the defendant. The video is particularly helpful in actually portraying the remnants of the stone wall referred to in the ambiguous deed as well as its proximity to the barbed wire fences referred to in the evidence.

he discredits the reliance on the evidence coming in on the location of the contested boundary under an unfavored hearsay exception. After indicating that he agrees that the deed involved is ambiguous, he claims that the deed describes the boundary as beginning at the northwest corner of the property, but in actuality, he argues, the starting point is located at South Brook Road, which is on the south side of the property.

Both parties offered expert testimony. The attorney trial referee credited the evidence of Filip over that of Normandin. The attorney trial referee found that the disputed east-west boundary line between the property of the parties was the "dashed line" depicted on the boundary survey prepared by Filip. That survey was the plaintiff's exhibit G. There was also other evidence from lay witnesses that supported that conclusion.

Filip, in arriving at his determination of the location of the boundary, conducted a thorough investigation of Hampton land records as far back as the 1840s, including records of the location of various abutters particularly along Brook Road, which was the starting point for the description of the plaintiff's land in the 1953 deed to him from Elizabeth. In walking the area pointed out to him by the plaintiff as the boundary, Filip noted the presence of strands of wire, some barbed and some not. The earliest strands were without barb, which he opined were of the vintage of the 1920s and 1930s. Other wire strands were plain wire without barbs that was of an older vintage. This wire "fence," which involved wire on both sides of trees, followed a course that he opined, based on all the information available to him, had been an east-west stone wall. He found remnants of that stone wall. In summary, the wire strands contained wire of at least three vintages, that of the type used for some years prior to the 1920s, some used in 1920s and 1930s and the newer thinner barbed wire, which started to be used probably twenty years ago. He did not, however,

find extensive evidence of monumentation. He was able to do so when he started on South Brook Street where he depicted the boundary between the abutter Roure and the plaintiff where "there's a partial wall—three or four strands of wire there." This is part of his wire "fence." This anchors, with other evidence, Roure as the abutter in that area. Adjacent land abutting may be used as a monument if the boundary of that adjacent land, as here with the abutter Roure, is fixed. *Staff* v. *Hawkins*, supra, 135 Conn. 319. Filip's survey was prepared in accordance with Class A-2 survey standards.

On the other hand, Normandin never attempted to locate physical monuments in the field. Nevertheless, the defendant argues that because the deed involved was ambiguous, and the existing monuments "on the land between the parties [were] vague and unreliable," his expert "turned instead to the acreage call found in the deeds from Elizabeth . . . to Richard Koennicke." In his acreage call analysis, he examined three deeds conveying land to one Ebenezer Burnham during the early 1800s, enabling him to construct a 225 acre parcel from which the plaintiff's acre parcel conveyed by Elizabeth to William Koennicke (the predecessor of the defendant) was cut. In doing so, he did not integrate into his analysis whether his conclusion was at all affected by some forty-three other transfers of real estate in Hampton by Ebenezer Burnham as grantor between 1828 and 1878. Normandin's survey was prepared in accordance with Class D survey standards.

There was also further evidence indicating the intention of the parties of the 1953 deed from Elizabeth to Richard Koennicke to convey the field south of the stone wall that separated the two fields. As pointed out, that deed did contain references to some stone walls that no longer exist. Filip, however, in using historical evidence, principally the barbed wire fencing, was able

to establish the boundary line that tracks the calls set out in this deed and does not ignore any of those calls. Again, it is to be remembered that that boundary concerns only the east-west line between the parties.

Prior to her 1953 conveyance to Richard Koennicke of this southern parcel, Elizabeth owned the entire property, i.e., the acreage north and south of the stone wall. Before she conveyed the southern portion (now owned by the defendant), she identified the stone wall between the two fields as the boundary line and she offered to sell it to her brother, Kurt G. Koennicke,[16] telling him that if he did not buy it she was going to convey it to their uncle, Richard Koennicke, to satisfy her debt to him. Kurt himself testified that Elizabeth did offer to sell it to him and that at that time Elizabeth pointed out to him that the stone wall between the two fields was the boundary line. He also said "all the rest of it was what she gave back to Uncle Richard for [the] nonpayment of that $1500 . . . ." After her reconveyance to Richard Koennicke,[17] Elizabeth acknowledged, on more than one occasion, this stone wall dividing the larger field from the smaller field as the boundary line between her property that she had retained. Before the plaintiff purchased his land from his uncle, Richard Koennicke, he walked the boundary line with his uncle, who indicated to him that he was conveying to the plaintiff the land south of the stone wall dividing the two fields. Elizabeth did not utilize the land to the south of the stone wall after the plaintiff purchased it. When Elizabeth was looking for usable gravel deposits on the land she retained, she caused test holes to be dug for that purpose, and although such test holes came very close to the stone wall boundary, they were never located south of that stone wall. Such statements and

---

[16] Kurt G. Koennicke is deceased but his deposition was read at the trial.

[17] Richard Koennicke died over twenty years ago.

conduct by Elizabeth during her lifetime[18] are evidence of her intention with regard to her 1953 deed to Richard Koennicke. They are of the nature of admissions. *Putnam, Coffin & Burr, Inc.* v. *Halpern*, supra, 154 Conn. 513; *DiMaggio* v. *Cannon*, 165 Conn. 19, 22–23, 327 A.2d 561 (1973); *Turgeon* v. *Woodward*, supra, 83 Conn. 543–44; *Apostles of the Sacred Heart* v. *Curott*, supra, 187 Conn. 599. The same observation applies to her grantee, Richard Koennicke, who, during his lifetime had no dispute with Elizabeth over the stone wall constituting the boundary between the land she deeded to him and the land she retained at that time.

The plaintiff, now in his late sixties, testified that he was familiar with the property when it was entirely owned by his uncle. This familiarity started when he was under ten years of age and he began to help his father and his uncle maintain stone walls, put up new wire, build barways and the like. He was familiar with the boundary on an abutting parcel, and with the disputed east-west boundary and the wire fence in issue. He walked it with his father and uncle and later with Filip as the video was made. He agreed with the boundary line as drawn by Filip between the two fields. His credibility was for the trier to determine.

Conduct of the defendant is also properly considered on this issue and it avails the plaintiff. In June, 1980, the defendant contracted with the Rossi Corporation to log his land and that contract called for logging only north of the stone wall between the two fields. That contract covered his parcel, which was estimated to be 100 acres. At the time of the Rossi contract, the defendant placed his land in forestry classifications setting out his total acreage as 100 acres. It is worth noting that with the stone wall between the two fields as the boundary, the defendant's land totals approximately

---

[18] Elizabeth died sometime prior to June, 1980.

100 acres. Moreover, at least since the time of the Rossi contract, the defendant has paid taxes on 100 acres and no more.

One more claim of the defendant on the boundary issue merits discussion. He claims that certain findings of the attorney trial referee are inconsistent and, therefore, clearly erroneous. See *Stamford* v. *Kovac*, 36 Conn. App. 270, 274–75, 650 A.2d 626 (1994).[19] The claim is that a fatal inconsistency exists between the finding that the boundary line between the land of the plaintiff and that of the defendant was the stone wall as depicted on the dashed line on Filip's boundary survey while at the same time also finding that "the defendant removed stones the plaintiff placed at another location to make [the plaintiff's] boundary."[20] The defendant claims, without more, that the attorney trial referee "cannot consistently make the finding that the remnants of a stone wall [between their properties] was the boundary line and at the same time conclude that the boundary was somewhere else." We do not agree with the defendant.

The plaintiff testified that a stone wall was the division line between his land and that of the defendant. He also said that there were barways in that wall that permitted access to the fields to the north and south of that wall. He placed stones in those barways[21]

---

[19] " 'In addressing a challenge to the facts found by the trial referee and adopted by the trial court, this court's function is to determine whether those findings were clearly erroneous. Practice Book § 4061. Because the resolution of conflicting factual claims falls within the province of the trial court, we can reverse the judgment only if the findings are clearly erroneous.' " *Stamford* v. *Kovac*, supra, 36 Conn. App. 274–75.

[20] Actually, this finding as made by the attorney trial referee was that "the defendant removed stones the plaintiff placed to mark the boundary line."

[21] The video in evidence of the stone wall and the wire fence is particularly helpful. It shows a stone wall for some of the length of the boundary line with several barways in that portion of the wall still extant. The remaining portion of the wall, the plaintiff states, "might be characterized as a 'remnant.' " The defendant has referred to what is said to be the stone wall as "fragmentary monumentation." In any event, on all the evidence, Filip's

attempting to block them so as to inhibit the defendant's trespasses on his land south of that wall. The defendant, however, bulldozed "the rocks way out into his own field." This happened on a number of occasions. These stones, so placed by the plaintiff in his barways, served to underscore the plaintiff's claim that, thus placed, they serve as evidence of his boundary. The defendant, by wrongfully bulldozing them elsewhere, cannot change that.

We conclude here that the trial court's adoption of the attorney trial referee's findings was not clearly erroneous. We conclude on the quiet title issue that the attorney trial referee properly determined that "the boundary of the plaintiff and the defendant is the dashed line depicted by Stephen A. Filip on his boundary survey, Exhibit G."

## II

Next, we turn to the defendant's claim that the trial court could not properly find criminal trespass in this civil action because it lacked jurisdiction to do so. The trial court found that the defendant's actions constituted criminal trespass in violation of General Statutes § 53a-107.

Section 52-560 provides that any person who cuts, destroys or carries away any trees standing on the land of another "without the license of the owner" shall pay to the injured party three times the reasonable value of such trees. Where, however, the court is satisfied that the defendant "was guilty through mistake and believed that the tree[s] . . . w[ere] growing on his own land" then the court shall render judgment for no

---

analysis together with the supporting evidence already set out shows that Filip's placement of the boundary line was properly found by the attorney trial referee and the trial court to have been proven. No matter what the condition of the stone wall or how much of it is no longer physically extant, it is clear that the plaintiff never built any part of it.

more than their reasonable value. In this case, it was found that although the defendant was aware that the plaintiff has claimed the disputed area as his own since 1963, he took no action. Despite this knowledge and his acquiescence, by his conduct, for many years in apparent recognition of the plaintiff's title, the defendant did later enter the plaintiff's property and, since November, 1988, has cut approximately 100 trees with a combined value of $4000.[22]

In her memorandum of decision, the attorney trial referee stated that the "plaintiff is entitled to $12,000 in damages on count two." Immediately thereafter, her memorandum of decision states: "This court would have recommended an award of attorney's fees for trespass however no evidence of an appropriate award was provided. However, in view of defendant's threats to plaintiff there is justification to award heightened damages. Accordingly, plaintiff's damages should be increased by half to $18,000."

Thereafter, the trial court accepted the report of the attorney trial referee. The court also ordered as adopted her memorandum of decision "except for the award of punitive damages in count three. See *Chykirda* v. *Yanush*, 131 Conn. 565, 569 [41 A. 449] (1945)." The court's order went on to state: "Judgment is entered in favor of the plaintiff as to count one establishing title to the disputed premises by deed; as to count two in the amount of $12,000; and, as to count three that a trespass has been committed by the defendant. Judgment is entered in favor of the defendant as to count four . . . ."[23]

---

[22] In addition to these findings in her report, the attorney trial referee, in her memorandum of decision, points out that "there is nothing in evidence which lends credence to the *possibility* that [the defendant] unequivocally thought the land was his." (Emphasis added.)

[23] The attorney trial referee's memorandum of decision states: "Since defendant continued to enter the disputed portion despite plaintiff's attempts to keep him out directly and through counsel, defendant's conduct is a

The plaintiff's complaint alleges that the "[d]efendant's actions constitute criminal trespass in violation of [§ 53a-107]." That section of the statutes, as the defendant properly points out, is a criminal statute which defines "Criminal Trespass in the First Degree and is classified as a Class A misdemeanor."[24] It is the most serious degree of the crime of trespass. The defendant argues that because the attorney trial referee was being asked in this case to hear and decide a civil matter, she did not have subject matter jurisdiction to hear a criminal charge and that "the trial court clearly erred as a matter of law in considering the claim for criminal trespass."[25] We agree. The trial court and the attorney trial referee did not have jurisdiction to hear and decide that claim.[26]

The fact remains that the trial court rendered judgment "as to count three that a trespass had been com-

violation of [§ 53a-107]." The trial court rendered judgment "as to count three that a trespass has been committed by the defendant."

[24] General Statutes § 53a-26 entitled "Misdemeanor: Definition, classification, designation," provides in relevant part: "(a) An offense for which a person may be sentenced to a term of imprisonment of not more than one year is a misdemeanor.

"(b) Misdemeanors are classified for the purposes of sentence as follows: (1) Class A, (2) class B, (3) class C and (4) unclassified. . . ."

[25] In arguing that the attorney trial referee and the trial court erroneously sought to exercise criminal jurisdiction, the defendant also points out that he was not under arrest for criminal trespass and that the trial court presumptively used the incorrect standard of evidence in determining his guilt under this criminal statute.

[26] The defendant claims that this issue is moot unless the cross appeal is sustained, since the trial court rejected the attorney trial referee's award of "enhanced damages." The defendant apparently misperceives the doctrine of mootness. "An issue is moot when the court can no longer grant any relief." *Ivimey* v. *Watertown*, 30 Conn. App. 742, 754, 622 A.2d 603, cert. denied, 226 Conn. 902, 625 A.2d 1375 (1993); see *Shays* v. *Local Grievance Committee*, 197 Conn. 566, 571, 499 A.2d 1158 (1985). The third count, concerning which jurisdiction in this case never existed, could never be the source of granting relief. See 1 A. Freeman, Judgments (5th Ed. 1925) § 321. Moreover, no valid argument can be made making the jurisdictional issue on the third count in any way contingent upon the sustaining or overruling of the cross appeal as the plaintiff claims.

mitted by the defendant . . . ." Its "judgment" as to count three was, as the defendant claims, "rendered" without jurisdiction. Our Supreme Court has stated: "As applied to a court, the word 'jurisdiction' means the power to hear and determine a cause." *Samson* v. *Bergin*, 138 Conn. 306, 309, 84 A.2d 273 (1951); *LaReau* v. *Reincke*, 158 Conn. 486, 492, 264 A.2d 576 (1969); *Brown* v. *Cato*, 147 Conn. 418, 422, 162 A.2d 175 (1960). "It is well established that a court is without power to render a judgment if it lacks jurisdiction and that everything done under the judicial process of courts not having jurisdiction, is, ipso facto, void. *Martin* v. *Hunter's Lessee*, 14 U.S. (1 Wheat.) 304, 364 (1816); *Marshall* v. *Clark*, 170 Conn. 199, 205, 365 A.2d 1202 (1976); *Clover* v. *Urban*, 108 Conn. 13, 17, 142 A. 389 (1928)." *Chrysler Credit Corp.* v. *Fairfield Chrysler-Plymouth, Inc.*, 180 Conn. 223, 229, 429 A.2d 478 (1980) (*Loiselle, J.*, concurring).[27] The trial court's judgment on the third count was void on its face. Clearly, there was no subject matter jurisdiction. "A judgment void on its face and requiring only an inspection of the record to demonstrate its invalidity is a mere nullity, in legal effect no judgment at all, conferring no right and affording no justification . . . . It neither binds nor bars anyone. All acts performed under it and all claims flowing out of it are void. The parties attempting to enforce it may be responsible as trespassers." 1 A. Freeman, Judgments (5th Ed. 1925) § 322. A void judgment "is without life and will be ignored everywhere." *Southern New England Telephone Co.* v. *Public Utilities Commission*, 165 Conn. 114, 123, 328 A.2d 695 (1973); see 46 Am. Jur. 2d, Judgments § 31 (1994). "A court is without

---

[27] The Restatement (Second), Judgments § 11, comment (b) (1982), states: "The rules of subject matter jurisdiction of a court are generally prescribed by the political authority that created the court . . . . Questions of subject matter jurisdiction are therefore matters of organic law of the government involved, state or federal . . . ."

power to render a judgment if it lacks jurisdiction of the parties or of the subject-matter, one or both. In such cases, the judgment is void, has no authority and may be impeached." *O'Leary* v. *Waterbury Title Co.*, 117 Conn. 39, 43, 166 A. 673 (1933); *Krueger* v. *Krueger*, 179 Conn. 488, 493, 427 A.2d 400 (1980). It is concluded that the trial court improperly rendered judgment on the third count; that judgment of trespass was, and is, void.

Despite our conclusion that the judgment of trespass rendered on the third count is void, further discussion of it is necessary because of the effect of it claimed by the parties as to the second count. The defendant contends that because the only "explicit finding of trespass was made regarding criminal trespass" and because "no penalty was imposed for violation of § 53a-107, the only purpose for a finding of criminal trespass was for use in finding a violation of the tree cutting statute [§ 52-560]." He further argues that "[t]herefore, the use of the wrongful determination of a criminal trespass to establish a violation of the tree cutting statute is fatal to the finding of a wrongful tree cutting." The plaintiff, in answering the defendant's claim that a finding of criminal trespass cannot be made in a civil action, says that that claim is "ill-founded and misconstrues both the plaintiff's complaint and the ruling" by the attorney trial referee. In doing so, the plaintiff concedes that his complaint alleged a claim that the actions of the defendant were wilful and without basis "since they constituted violations of the standards established by . . . § 53a-107," but argues that he did not seek criminal sanctions, and the attorney trial referee did not presume to impose criminal sanctions. Moreover, he argues that the third count was proper both as to a claim for damages for trespass and to a claim for punitive damages for the wrongful cutting of

trees. The plaintiff maintains that, in claiming punitive damages, a plaintiff must clearly allege wilful and egregious conduct of the defendant in order to justify the imposition of punitive damages. Therefore, he claims that the allegation that the defendant's actions were "the equivalent of criminal trespass in the first degree is a factual pleading that the actions were willful and egregious and could therefore be the basis of the imposition of punitive damages under [General Statutes] § 52-560." While he concedes that he seeks "damages and punitive damages" arising out of his claim as to the third count vis-a-vis the second count, the plaintiff nevertheless urges that he "sought no criminal sanction" and the trial court imposed no such sanction on the defendant.

However much the plaintiff appears to distance himself from "the no criminal sanctions were sought or imposed" aspect of the judgment on the third count, at the same time, he adopts the finding by the attorney trial referee and the judgment of the trial court of trespass on that count, and in doing so he disingenuously maintains that the trial court improperly rejected the attorney trial referee's recommended award of damages for trespass. This whole controversy swirls around the award by the attorney trial referee of the $6000 of "heightened damages." Pointing out that the attorney trial referee concluded that "in view of the defendant's threats to the plaintiff there is justification to award heightened damages."[28] The plaintiff contends that he is entitled to the $6000 "enhanced damages" award.[29] In granting the

[28] The plaintiff, in his brief, refers to the heightened damages recommended by the attorney trial referee as "enhanced" damages. The attorney trial referee never used the term "enhanced damages" in either her finding or her memorandum of decision.

[29] The attorney trial referee, who cited no legal authority for her award of the $6000 of "heightened damages," arrived at that figure by "increasing" by one-half the $12,000 award on the second count to $18,000.

"heightened" damages, the plaintiff claims that the attorney trial referee was "merely making an appropriate damages award for the consequence of defendant's trespasses." The trial court refused to approve the attorney trial referee's award of "common law punitive damages" as recommended in the attorney trial referee's memorandum of decision.

The plaintiff's drawing on § 53a-107 is somewhat disingenuous. He argues, on the one hand, that it is in the case only to permit the establishment of the elements of a criminal trespass in order to provide the basis for finding that egregious conduct that he admittedly wants to use, and the attorney trial referee did use to justify the "heightened" damages. Yet, selectively, he says that there has been no criminal sanction imposed under § 53a-107, nor did he ask for any. He does not offer any authority[30] to support his contention that this criminal

---

[30] The plaintiff, speaking of "enhanced civil damages," says that there are many circumstances where "allegations of violation of a statute which is criminal in nature may be made to establish entitlement to enhanced civil damages." By way of example he cites General Statutes §§ 14-295 and 52-564. The former statute does provide that the trier of fact may award double or treble damages where the defendant has operated a motor vehicle "deliberately or with reckless disregard" in violation of any of nine specific statutes set out in § 14-295. The latter statute provides for the payment of treble damages against any person "who steals any property of another or knowingly receives and conceals stolen property . . . ." There are other statutes that allow the recovery of double or treble damages in addition to compensatory damages by specifically so stating that in the statute. Such statutes include General Statutes §§ 52-565, 52-566, 52-567, 52-568, 52-569, 52-560 and 47a-46. These are statutes that specifically use the words "punitive damages" in awards authorized by such statutes. See General Statutes §§ 31-290a, 52-240b.

The plaintiff, however, has not pointed to any statutory authority for the awarding of "heightened" damages where the statute involved already contains, as does § 52-560, for damages over and above compensatory damages and where the trebling of his compensatory damages has already been adjudged. Simply, the plaintiff's actual loss was found to be $4000 but because of the circumstances, the attorney trial referee recommended and the trial court ordered judgment for $12,000 on the second count, thus giving him the maximum recovery which was provided for under § 52-560.

statute, a first class misdemeanor, may properly be pleaded and employed here as he claims. Pleading it as he does, as a separate count, as a separate cause[31] of action, on which a judgment of trespass was "rendered" by the trial court which he accepted, the plaintiff cannot now insist that he is entitled to draw on the third count to support the "heightened damages" award of $6000 and otherwise to disavow the overt criminal character of § 53a-107.

Moreover, the plaintiff's argument, that we should adopt his claim that he is entitled to "enhanced civil damages" because of his claim that there are many circumstances in which allegations of a statute which is "criminal in nature" may be made to establish entitlement to "enhanced civil damages," is wholly unpersuasive in this case. The tree cutting statute does "not give a new and independent cause of action," but prescribes "the measure of damages in cases where compensatory damages would, in the absence of the statute, be recoverable." *Avery* v. *Spicer*, 90 Conn. 576, 583, 98 A. 135 (1916). In providing for damages in excess of actual damages, the amount "is assessed with reference to the degree of the defendant's culpability." *Cristilly* v. *Warner*, 87 Conn. 461, 469, 88 A. 711 (1913) (*Beach, J.,* dissenting). Our Supreme Court has indicated its recognition that the damages provision of the tree cutting statute does contain considerations of the culpability aspect of the defendant's conduct. In *Banks* v. *Watrous*, 134 Conn. 592, 600, 59 A.2d 723 (1948), our Supreme Court stated: " 'The statute, like others in the statute book which provide damages for wrongful conduct in excess of those ordinarily recoverable, is not a penal statute . . . it affords the basis of a civil action in which the damages, "assessed because of and with reference to the degree of the defendant's culpability

---

[31] See Practice Book § 138.

may be, and generally are, compensatory in their nature, although they embrace injuries or expenses not included in strict legal damages." ' " *Doran* v. *Rugg*, 22 Conn. Sup. 189, 193, 164 A.2d 859 (1960) (*House, J.*). The place of culpability in the calculus of damages comes in only where the defendant has not sustained his burden of proof on the matter of the statutory provision for mitigation of mistake. See id., 192–93. It becomes evident that § 52-560 has built into its provision for treble damages, "increased"[32] damages over "actual damages sustained" that invokes the culpability aspect of the defendant's conduct.

### III

Having discussed certain interaction between the first and second counts from the perspective of damages, we now turn directly to the second count, which is brought under § 52-560. In addition to what we have already said about § 52-560, we point out the following considerations. Since trespass is a possessory action, it is necessary for the plaintiff to prove possession,

---

[32] The plaintiff makes reference to the $6000 award as "enhanced" damages. His analysis as to just how "enhanced damages" is to be defined is lacking. We do note, however, that courts, when addressing the double or treble damage statutes, have referred to such damages as involving "statutorily enhanced damages." *Avis Rent A Car System, Inc.* v. *Liberty Mutual Ins. Co.*, 203 Conn. 667, 671, 526 A.2d 522 (1987); *Caulfield* v. *Amica Mutual Ins. Co.*, 31 Conn. App. 781, 785, 627 A.2d 466, cert. denied, 227 Conn. 913, 632 A.2d 688 (1993). The environmental statutory scheme permits the recovery of "[statutorily] enhanced damages." See General Statutes § 22a-451 (a), allowing damages equal to "one and a half times the costs and expenses incurred," and in certain circumstances "two times the costs and expenses" incurred by the department of environmental protection in handling certain types of environmental law violations, and *Connecticut Resources Recovery Authority* v. *Refuse Gardens, Inc.*, 229 Conn. 455, 457, 642 A.2d 697 (1994).

We have already decided that the void nature of the judgment of the trial court affords him nothing that may be imported into the second count. Neither can his reference to "enhanced damages" or "heightened damages" entitle him to claim validly that he is entitled to anything more than treble damages under the second count which invokes § 52-560.

actual or constructive, to prevail. *Wadsworth Realty Co.* v. *Sundberg*, 165 Conn. 457, 461, 338 A.2d 470 (1973); *More* v. *Urbano*, 151 Conn. 381, 383, 198 A.2d 211 (1964). This, the plaintiff has done. "To escape the imposition of treble damages, it was incumbent upon [the defendant] to prove not only mistake but the further . . . affirmative belief that the timber was growing on his own land." *Doran* v. *Rugg*, supra, 22 Conn. Sup. 195. This, the defendant did not do. The mistake, of course, that is necessary to resist successfully the imposition of treble damages under the statute must be an honest mistake and belief. See *Petroman* v. *Anderson*, 105 Conn. 366, 371, 135 A. 391 (1926); *Doran* v. *Rugg*, supra, 194.

We have determined that the plaintiff cannot draw at all on the third count in any fashion to aid him in his claims, especially for damages, which he makes for enhanced or heightened damages under the second count. Nevertheless, he claims that there is authority to permit such damages, over and above the treble damages of $12,000 awarded to him under § 52-560. Arguing that such venerable cases as *Hart* v. *Brown*, 2 Root (Conn.) 301 (1795), and *Edwards* v. *Beach*, 3 Day (Conn.) 447, 450 (1809), allowed damages for malice and insult as well as actual loss in trespass action, he maintains that the same should be done here. Those cases are easily distinguishable as neither involved tree cutting and there was such a statute in those days. Moreover, he offers no analysis as to why such damages should be allowed when § 52-560 does not provide for them although the legislature has included in the treble damages provision a culpability factor over and above actual loss. See *Banks* v. *Watrous*, supra, 134 Conn. 600; *Avery* v. *Spicer*, supra, 90 Conn. 583; *Doran* v. *Rugg*, supra, 22 Conn. Sup. 193. Moreover, "[w]hen a cause of action has been created by a statute which expressly provides the remedies for vindication of the

cause, other remedies should not readily be implied." *Fleischmann Distilling Corp.* v. *Maier Brewing Co.*, 386 U.S. 714, 720, 87 S. Ct. 1404, 18 L. Ed. 2d 475 (1967); *Getty Petroleum Corp.* v. *Bartco Petroleum Corp.*, 858 F.2d 103, 112 (1988). The ability to provide for such damages under § 52-560, as the plaintiff claims here, is a matter for the legislature. As the Supreme Court said in a case where attorney's fees were provided under certain provisions of a statute and not elsewhere in that statute: "To put it simply, when the General Assembly wanted to authorize the award of attorney's fees it knew how to do it."[33] *Chrysler Corp.* v. *Maiocco*, 209 Conn. 579, 593, 552 A.2d 1207 (1989); *Marsh, Day & Calhoun* v. *Solomon*, 204 Conn. 639, 652–53, 529 A.2d 702 (1987). We conclude that the trial court properly rendered judgment for the plaintiff in the amount of $12,000.

The judgment is reversed only as to the finding of criminal trepass on the third count, and the case is remanded with direction to render judgment as on file except as modified to eliminate that finding.

In this opinion the other judges concurred.

---

[33] The plaintiff has not demonstrated any persuasive reason for not following "[t]he general rule of law known as the American rule . . . that attorney's fees and ordinary expenses and burdens of litigation are not allowed to the successful party absent a contractual or statutory exception." (Citations omitted.) *Chrysler Corp.* v. *Maiocco*, 209 Conn. 579, 590, 552 A.2d 1207 (1989).