[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
Plaintiff has instituted this action by a complaint which sets forth his claims in two counts. The first count seeks to quiet title to a twenty-five acre[1] parcel of land in the Town of Groton, which it is alleged adjoins land of the defendant. In the second count, plaintiff claims title by adverse possession to the same twenty-five acre parcel. Defendants have denied the essential allegations of both counts of the complaint.
At the outset, it should be noted that General Statutes §47-33b the "Marketable Record Title Act" is not applicable in this case which involves two competing claims of title. MedwayAssociates v. Shoneck, Superior Court, judicial district of New Haven at Meriden, Docket No. 234874 (Jun. 22, 1992)
For reasons hereinafter stated, judgment is rendered for defendants.
 I
The first count is a claim involving the record title to land in the town of Groton. "All actions to determine record title of any interest in real property are governed by General Statutes § 47-31. The statute requires that the complaint in such an action describe the property in question, state the plaintiff's claim, interest or title and the manner in which the plaintiff acquired the interest, title or claim, and it must also name the person or persons which may claim the adverse interest or estate. The burden of proof in this case is on the plaintiff to prove that the boundary is where he claims it to be. . . . The plaintiff is required to prevail on the strength of his title and CT Page 6857 not on the weakness of his adversary's claim." Koennicke v.Maiorano, 43 Conn. App. 1, 9 (1996). (Citations omitted.)
The complaint alleges, and the evidence confirms, that plaintiff acquired title to land in the Town of Groton by virtue of two deeds. The first deed was executed by Jesse B. Stinson, administrator of the estate of Marietta Lester Smalle on November 12, 1971. The second was a quit claim deed from Edna C. Crawford executed November 30, 1971.
Both deeds purported to convey a one half interest in the same tract of land described as being bordered on the north by land now or formerly of Pierce Hall, on the east and south by land by James Romanella and Sons, Inc. and on the west by land of Donald M. and Gloria Greenman.
Plaintiff did not acquire title by warranty deed. He was not represented by an attorney at the time he acquired the property and he did not have a survey prepared or the title searched prior to the conveyance and the deeds contained no references to other deeds in the chain of title.
At the time plaintiff acquired title to the land, it is fair to describe it as interior forest land with numerous stone walls. There was an old apple orchard on the property but, for those few who used the property, such use was limited to hiking and hunting.
Although the deeds by which plaintiff acquired title made no reference to distances, monuments or the source of title, plaintiff believed that the land which he acquired included a potion of the land conveyed to James Romanella Sons, Inc. (hereinafter Romanella) in 1969. Plaintiff's belief that in acquiring the interests of Smalle and Crawford to their land, he also acquired title to a portion of the land previously conveyed to Romanella was based primarily upon his knowledge of the area having been brought up on a farm in the immediate area. He was also in possession of a sketch map acquired from Jesse B. Stinson, who was associated with the Odd Fellow's home and was the administrator of Smalle's estate. This sketch map appeared to confirm plaintiff's belief concerning the property. There was no evidence as to the source of this sketch, who prepared it or upon what information it was based.
Subsequently, plaintiff brought his claim to the attention of CT Page 6858 the Romanella company which referred plaintiff to the corporation's surveyor Lawrence Bentley. Plaintiff and Bentley discussed the claim but without resolution.
By deed dated December 29, 1969, Romanella had acquired title to the large tract of land described in plaintiff's deeds as being easterly and southerly of his land. Romanella received the property by warranty deed of Owen S. Miner. The deed from Miner to Romanella contained a long detailed engineer's description prepared by Bentley, a licensed professional engineer and surveyor. The deed indicated that the land conveyed contained 221.5 acres more or less. Bentley also prepared a map entitled "Plan Showing Property of Owen S. Miner westerly of Gales Ferry Road Town of Groton and Ledyard, Conn. Scale 1" = 100' November, 1969 DiCesare-Bentley-Welling Engrs. Groton, Connecticut."
As alleged in the complaint, and confirmed by the evidence, defendants acquired title to the Romanella land by warranty deed dated April 30, 1987. The deed from Romanella to defendants contained the same detailed description as in the deed from Miner to Romanella with Bentley's map included by reference.[2]
The engineer's description of the land, and the map used in the conveyance from Miner to Romanella, and from Romanella to defendants were prepared on the basis of Bentley's exhaustive research into the land and probate records as well as an examination of the land itself, stone walls and monuments on the ground.
Although the evidence is conflicting, it is more probable than not that during the preparation of the survey and map for Romanella, Bentley walked the property line with a person who professed some knowledge of the perimeter of the Miner property. Who that person was, or what his qualifications were, cannot be determined from the evidence. Bentley claims that it was Owen Miner's son-in-law, Joseph Sandora. The evidence, however, is clear that Sandora did not accompany Bentley on any such walk. The evidence is also clear that it was not Owen Miner himself or his son, David H. Miner, who testified in this case.
In any event, the perimeter walk was only one facet of Bentley's research into the title. The evidence, however, precludes the drawing any inference from Mr. Bentley's testimony concerning the walk. CT Page 6859
Plaintiff retained the services of George Dieter, a registered land surveyor, to prepare a map of the property which he had previously acquired from the Smalle estate and Crawford in 1971. This map shows plaintiff's property to be 120.33 acres in area and is entitled "Plan showing property of Richard C. Hall, Gungywamp Hill section Groton, Connecticut Scale 1 inch = 100 feet April, 1976. The map was revised in 1993 to show the area of the claimed encroachment by defendant as 26.14 acres at the south easterly corner of the property. Under the title to the revised map was written "Revised February 16, 1993 to show land encroached on and owned by Richard C. Hall."
At the top of both maps it was noted by Dieter "The perimeter of this property is as indicated on old maps sketches and deeds that were given to R.C. Hall by the Odd Fellows and the survey was made as the walls and lines were exposed and indicated by Mr. Hall."
Dieter did not undertake any search of the land or probate records in the preparation of his survey. As the legend on the map indicates the perimeter of plaintiff's land, as depicted on the map, was produced by plaintiff showing Dieter where he believed the property lines to be. In doing this, plaintiff relied upon his personal recollections and the sketch obtained from Jesse B. Stinson. Stone walls and other monuments were also relied upon and many of the distances shown by Dieter were taken from Bentley's map.
Maps produced in a similar manner were not considered of sufficient evidentiary value so as to create a genuine issue of material fact by Healy, JTR in granting a motion for summary judgment. Medway Associates v. Shoneck, supra Superior Court, judicial district of New Haven at Meriden, Docket No. 234874 (Jun. 22, 1992).
It must be concluded that Dieter's maps are simply a pictorial representation of plaintiff's claim but little evidence in support of that claim. Banks v. Watrous, 134 Conn. 592, 595
(1948).
The sketch map obtained by plaintiff from Jesse B. Stinson which was relied upon by plaintiff and Mr. Dieter in the preparation of Dieter's maps is of little evidentiary value. The origin of this document is unknown. Who prepared the sketch, for what purpose it was prepared or what information the preparer CT Page 6860 relied upon are all unknown. There was no reference to the document in either of the conveyances to plaintiff or in any other deed in evidence. In this connection see Com.Pennsylvania Game Commission v. Keown, 471 A.2d 937, 939
(Pa.Commw. 1984) § 119, 12 Am.Jur.2d.
It is first necessary to examine the deeds by which plaintiff acquired his title because the law requires that he prevail on the strength of his title and not on the weakness of defendant's title. Koennicke v. Maiorano supra 43 Conn. App. 9. In determining the effect of a deed as a written contract, the inquiry must be, not what the parties intended, but what is the intent which is expressed in it, and if the description it contains as applied to the property is clear and unambiguous, that description must be given effect. Patzloff v. Kasoerovich,116 Conn. 440, 441-442 (1933).
As previously noted, both deeds by which plaintiff acquired title contained no distance, courses or references. The deeds merely described the property by reciting the names of the adjoining property owners without reference to stone walls or other monuments. It is well settled as a rule of the construction of deeds that "[w]here the boundaries of land are described by known and fixed monuments which are definite and certain, the monuments will prevail over courses and distances. Koennicke v.Maiorano, supra, 43 Conn. App. 10. The land of adjoining property owners, under certain circumstances, can be considered monuments to establish the boundary lines of a tract of land. Velsmid v.Nelson, 175 Conn. 221, 227 (1953).
At the time plaintiff's deeds were drawn in 1971, Romanella had already acquired title to the adjoining land from Miner. Both of the conveyances to plaintiff describe the land conveyed as bounded east and south by Romanella and on the west by Greenman. Other deeds in plaintiff's chain of title, both in the Smalle and Crawford line use the same basic description with Miner being on the east and south.
Both Dieter maps and Bentley's map confirm that plaintiff's land is bounded on the east by the Romanella/Miner, now defendant's land.
The area in question contains numerous stone walls. Dieter's map follows the stone walls, adjacent to defendant's property along the easterly boundary in an almost straight line then CT Page 6861 deviates to the east to effect a small projection easterly into what was the Romanella's property. Bentley's map follows the easterly boundary along the stone wall and then another wall westerly and southerly resulting in the claimed encroachment. Following Dieter's line, the only portion of Romanella's land lying south of plaintiff's land would be the southerly boundary of the easterly jog in the line. This is an insignificant deviation in the easterly boundary. Considering this as the southerly boundary of the entire tract is not logical. Bentley's map, which shows a substantial projection westerly, places a substantial portion of Romanella's land southerly of plaintiff's land and is much more consistent with the deed description which describes the land as being bounded easterly and southerly on Romanella's land
Although Bentley's map is more consistent with the description in plaintiff's deeds, it is not conclusive. Therefore, other evidence must be considered in an attempt to resolve the problem of title to the disputed area. Apostles ofSacred Heart v. Curott, 187 Conn. 591, 598 (1982).
To assist in establishing his title, plaintiff retained the services of Ruth Bowers, an experienced title researcher with excellent credentials. Her testimony supported the Dieter survey. Beginning six or seven years ago, Ms. Bowers began examining the land and probate records concerning plaintiff and defendants' chains of title. She recited the difficulties which she encountered in her search which, like Bentley's extended into the early 1700's. Her problems involved not only the vagueness of descriptions which continued into the deeds to plaintiff, but also changing names, marriages and lack of documentation in the land records. Many of the relevant deeds have no description susceptible to an analysis of shape, size or measurement.
An example of the problems involved here is that Bentley's 1969 map shows Miner's land bounded on the west by the land subsequently acquired by plaintiff, but then owned by the Odd Fellows and Edna L. Crawford. No mention is made of Marietta Lester Smalle. Ms. Bowers contends that the Odd Fellows never acquired this land but that land conveyed to the Odd Fellows by Smalle was some distance away. Yet there is strong evidence that at the time plaintiff acquired title, the land was being taxed to the Odd Fellows.
By putting together various deeds in plaintiff's chain of CT Page 6862 title, Ms. Bowers concluded that plaintiff acquired a total of 226 acres. This is far in excess of the 120.33 acres determined by Dieter. Dieter's figure is also at variance with numerous deeds in plaintiff's chain of title, which describes the property as being 100 acres more or less. When plaintiff applied to place his land in a forestry program, he testified it as being 95 acres together with 20,000 square feet retained for a residence. It is significant to note that Dieter's 1976 map shows plaintiff's property, less the area of the claimed encroachment, as being 94.19 acres.
Mr. Bowers testified concerning the two main deeds which established plaintiff's property. The first was a conveyance from Elijah Bailey to Amos Colver in 1799. The description of this 60 acre tract was recorded in Vol. 13 at Pg. 35. The record conveyance took place in 1787 and was from Forsith to Amos Colver recorded in Vol. 11 at pg. 19 containing 30 acres. It was difficult to place that tract but it appears to adjoin the 60 acre tract on the south. There also appears to have been another four acre tract south of the above two tracts acquired by Colver in 1800. These conveyances into plaintiff's claim of title are not greatly in dispute.
It is also claimed that two deeds recorded in 1766 establish the easterly boundary of plaintiff's land and confirm plaintiff's title to the disputed area.
The first deed from James Forsith to Andrew Forsith recorded in Vol. 7 at pg. 31 contains fifteen acres. The second deed from James Forsith to Nathan Forsith is recorded in Vol. 7 at pg. 33 and does not mention acreage. The significance of these instruments according to Mr. Bowers is the references to a well, a house and a highway. Dieter's maps indicate an old house foundation and a well near plaintiff's easterly boundary and an old road between the stone walls.
Plaintiff testified that an old public right-of-way called the Preston Road ran from Groton to Ledyard through the area. He also testified that the well shown in Dieter's map was a community well for the use of people and animals using the highway.
Bentley disputed the idea that a public highway ran through the area. He indicated that the steep and rocky terrain made a highway in the area unlikely. Bentley claimed that it was more CT Page 6863 likely that a laneway existed to allow farmers and their animals to get to their fields. This appears to be more consistent with the maps in evidence which show the entire area enclosed by stone walls. The highway would have ran through the Brown farm but there is no mention of it in the Brown Farm deeds. Also it might be expected for stone walls to be on both sides of a public highway. This does not appear to be the case.
It was also Bentley's conclusion based upon his research, that the land described in these two conveyances was southwest of the area in question where the Forsights has another farm.
Locating these two tracts where plaintiff claims they existed is difficult and they appear to conflict with other evidence and Dieter's maps which depict plaintiff's claim.
Mr. Bowers testified as to the importance of the boundary line agreement executed between Benjamin Brown and Abner Brown executed on May 2, 1736 and recorded in the Groton Land Records in Vol. 4 at p. 120 in determining the current property lines. Mr. Bentley also agreed to the importance of this document. Dieter used this agreement to establish the south easterly corner of defendant's property.
The better evidence indicates that Bentley who searched the records in connection with the Miner conveyance to Romanella in 1969 pointed this document out to plaintiff or Dieter.
This instrument recites that upon the death of Nathaniel Brown his farm passed to his sons Benjamin Brown, William Brown and Abner Brown, and that Benjamin had purchased William's interest. By the terms of the instrument the boundary line was established as:
 "First beginning at a heap of stones on a line due south 70 rods distance from a heap of stones that was erected by the proprietaries committee for a NW corner of a wood lot originally Jonathan Smitty and sd heap of stones first mentioned is about four or five feet west of a small ledge of rock and from that heap of stones 190 rods to the Great Brook, a heap of stones by the edge of sd Brook, Butternut trees a few foot to the south and a White Oak Tree a few foots to the North which bounds and line is and shall remain the dividing boundary and line between our aforesaid adjoining lands . . ."
The importance of this agreement lies in the fact that the CT Page 6864 portion reserved to Benjamin Brown became known as the "Brown Farm" and was in due course acquired by the Miner family and eventually by Owen S. Miner, Romanella and, finally, defendants.
Dieter testified that, with plaintiff, he located and measured the 190 rod Brown boundary from its easterly monument at Great Brook to its westerly monument a wall corner where he placed the southwesterly corner of defendants' property. He testified that this point was within a few feet of the 190 rod line from Great Brook with a pile of stones within a few feet west of a ledge. He also testified that he and plaintiff located a pile of stones with a white quartz rock which he determined to be the proprietor's stones which was almost exactly 70 rods due north of the wall corner.
Daniel Miner, Owen Miner's son, testified to the existence of the white quartz rock in the area. He referred to it as the treasure stone.
Dieter claims to have made his measurements in 1993. This, however, is not probable since Michael Giordano, defendant's son, had cleared the area prior to this date. He testified that he did not observe the treasure stone in the area at the time.
It is significant to note that neither of Dieter's maps, particularly the revised map of 1993 which showed the problem area, showed this monument.
The White Quartz rock is quite distinctive and differs from other rock piles in the area. If this significant stone was erected by the "proprietaries" it is logical for it to have been so described in the Brown boundary agreement. It was not. It is also questionable as to whether the stone would have remained in the condition as shown in evidence for almost 300 years.
Dieter began the measurement of the 190 rod line from a heap of stones at Great Brook. The evidence indicates that there was more than one heap of stones in the area of Great Brook. It is nor clear why one was selected over the other.
Bentley testified that he was unable to locate the heap of stones at Great Brook. He used other data to locate the southeast corner of defendants' property and then measured from the center line of the brook 190 rods. Bentley testified that the location of the brook had not changed very much over the years because of CT Page 6865 the rocky embankment on the westerly side and that any erosion would have been on the easterly side.
The differences in starting points resulted in a considerable discrepancy in the location of the southwesterly corner of defendants' property as shown in the two maps.
Bentley relied on the abutter's deed description to locate where he determined the proprietor's stone to have been at a bend in the wall. Plaintiff argues that the location must be in error since it was not on a line due north (the boundary agreement describes the point of as being due south) of the starting point. There is, however, nothing to indicate what is meant by due south as used in the 1736 instrument. There is nothing to indicate that a compass or surveyor's instrument was used to determine the line. This would be inconsistent with almost all other ancient deeds in evidence which contain no exact compass bearings. For this reason, the change in magnetic deviations over the years would not be a factor. In all likelihood "due south" was the equivalent of a "southerly direction".
At the very least, it cannot be found that Dieter's location of the proprietaries' stones and the south westerly corner of defendants' property was more accurate than Bentley's.
Bentley also testified that additional parcels of land came into defendants' chain of title and became part of the Brown farm. Mrs Bowers disputed this since there are no later references to these tracts. But considering the imprecise descriptions throughout, it is not improbable that these parcels became incorporated into the Brown Farm. All evidence indicates that the north-south line of the Brown farm (Miner property) was not a straight line and there is nothing to indicate that these two parcels came into plaintiff's chain of title.
Plaintiff claims that the tax assessor's maps support his claim of title to the disputed 26.14 acres. He testified that in the 1970's the assessor's map showed him as owner of the disputed tract. This is highly unlikely. Although the tax assessor's maps are working documents used for assigning tax liability and not for showing title, such maps have circumstantial relevancy in a case such as this with competing claims of title.
The evidence indicates that in 1969 one of Bentley's first steps in preparing his survey of the area was to consult the tax CT Page 6866 assessor's records. The information written on his map showing the Odd Fellows and Edna L. Crawford bounding the Miner property on the west came from the tax assessor's records. It is extremely doubtful that Bentley, knowing how the tax assessor's map showed the land to be held, would have shown Miner's boundary in the disputed area as he did without attempting to resolve the issue.
Also, when plaintiff applied for a forestry exemption he consulted the tax assessor's records. The application lists his acreage as 95.5 acres. This is not consistent with his ownership of the disputed area which would have given him a total of 120.33 acres.
Plaintiff pointed out that one of the tax assessor's maps in evidence appeared to show that a line consistent with Dieter's description of the disputed area had been altered by erasure. There, however, is no credible evidence as to the significance of the apparent alteration, how it came about, who did it, why or when.
It cannot be found that the tax assessor's record support plaintiff's claim of title to the disputed area.
Daniel Miner, the son of Owen Miner, testified for the plaintiff in this case. His testimony was supportive of plaintiff's claim. Although he had not been on the land in some time, he stated that he was familiar with it. He testified that the boundary line was as shown as Dieter's map and that his family did not claim title to the disputed area.
The testimony runs contrary to Bentley's testimony that he reviewed the boundary with Owen Miner, and that Mr. Miner approved with the boundary as determined by the surveyor.
The court is convinced that plaintiff, like Daniel Miner, is sincere in his belief that he holds title to the disputed area. The burden of proof, however, is on the plaintiff to prove that the boundary is where he claims it to be by the better evidence.
The plaintiff is required to prevail on the strength of his title and not on the weakness of his adversary's claim. Koennicke v.Maiorano, supra, 43 Conn. App. 9.
In this case, plaintiff has not sustained his burden of proof concerning title to the disputed 26.14 acres by a preponderance CT Page 6867 of the evidence.
 II
The second count of the complaint alleges that plaintiff has acquired title to the disputed area by adverse possession. Plaintiff alleged that beginning in 1977 and continuing for at least fifteen years, he has continuously, openly, exclusively and notoriously occupied and used the property in question in manners openly adverse to the interest of all other persons and has thus become the lawful owner of the disputed parcel.
Defendant has denied the allegations of this claim.
"The essential elements of adverse possession are that the owner shall be ousted from possession and kept out uninterruptedly for fifteen years under a claim of right by an open, visible and exclusive possession of the claimant without license or consent of the owner, . . ." General Statutes §52-575. Sanford v. Dimes, 3 Conn App. 639, 640 n. 2 (1985). A claim of title by adverse possession requires a claimant to prove that the owners have been ousted from possession from the property in dispute for an uninterrupted period of fifteen years under a claim of right by an open, notorious and exclusive possession. Colby v. Burnham, 31 Conn. App. 707, 723, (1933).
"[A] person who claims title by adverse possession is claiming that although he does not have record title, his proof of possession which is adverse, open, notorious and continuous for the entire statutory period entitles him, in an action to quiet title, to a judgment of ownership. " Marrin v. Spearow,35 Conn. App. 398, 402 (1994); citing Ruick v. Twarkins,171 Conn. 149, 155 (1976).
The "claim of right" or "adverse" requirement has been further explained as follows: "Use made under a claim of right means use that is made without recognition of the rights of the owner of the servient tenement. . . . To establish an easement by prescription it is absolutely essential that the use be adverse, it must be such as to give a right of action in favor of the party against whom it has been exercised. . . . The use must occur without license or permission and must be unaccompanied by any recognition of the right of the owner of the servient tenement to stop such use . . (Citations omitted; internal quotation marks omitted.) Crandall v. Gould 244 Conn. 583, 590-91
CT Page 6868 (1998).
"Where title is claimed by adverse possession, the burden of proof is on the claimant. The essential elements of adverse possession are that the owner shall be ousted from possession and kept out uninterruptedly for fifteen years under a claim of right by an open, visible and exclusive possession of the claimant without license or consent of the owner. The use is not exclusive if the adverse user merely shares dominion over the property with other users. Such a possession is not to be made out by inference, but by clear and positive proof. In the final analysis, whether possession is adverse is a question of fact for the trier. "The doctrine of adverse possession is to be taken strictly." (Citations omitted.) Roche v. Fairfield,186 Conn. 490, 498-99 (1982).
The land involved in this case was basically forest land with few visitors and minimal use until defendants arrived. It was used by unidentified people for hiking, and other similar field activities. Romanella acquired the property from Miner in 1969. That corporation made little direct use of the property. In making the survey, Bentley drilled holes in the stonewall. Bentley's firm was also retained to dig test holes in the area to determine the feasibility of using the land for a gravel pit. Romanella also gave permission to Daniel Miner and his brothers to hunt and fish on the entire tract. Bentley was also given permission to conduct such activities on the land and he did in fact use the property for such purposes and this involved going into the disputed area.
Plaintiff acquired his interest in the land in 1971. He testified that he posted the land in 1977 and 1978 using standard no trespassing signs. He also testified that he took fire wood from the disputed area and maintained the forest by removing dead wood. There was an orchard in the area and there was evidence that plaintiff pressed cider from apples still growing on the land. There was no evidence that plaintiff attempted to spray the apple trees or to preserve them or otherwise maintain the orchard. Plaintiff also testified that he entered the disputed area to repair walls and to keep paths open.
Defendants acquired the property from Romanella in 1987. Michael Giordano, defendants' son, testified that prior to his parents taking title to the property he walked the boundary of the land which had been flagged by Bentley's firm. He testified CT Page 6869 that he did not see any No Trespassing signs or other evidence that the property was being used. Starting in 1987, defendants undertook considerable work in the area. Prior to 1990, the area where Dieter and Hall claimed to have found the heap of stones with the Quartz rock was cleared and leveled. A horse barn was constructed in the area, riding trails were laid out and other improvements were made. Defendants spent approximately $150,000 on these improvements.
When plaintiff became aware of defendants' activities in the area, he complained to the police who told him it was a civil matter. he never confronted defendants or their son, but allowed them to continue their expensive improvements. he took no action consistent with ownership until the start of their lawsuit in November, 1995.
To prevail on his claim of adverse possession, plaintiff must establish adverse, open, notorious and continuous possession of the disputed land for the entire statutory period. While it must be concluded that plaintiff conducted activities within the 26.14 wooded area, it cannot be found that such activities were of such intensity or duration as to constitute proof of adverse, open, notorious and continuous possession of the land in question. Plaintiff testified that he conducted certain activities within the disputed tract. But there was little or no evidence as to the details which might constitute proof of adverse possession.
There was evidence that plaintiff may have posted the disputed area with No Trespassing signs as early as 1973. But there was no evidence that people using the land, such as Bentley observed any such signs. The most compelling evidence with respect to the signs is that Michael Giordano, prior to his formerly acquiring the property in 1987, walked over the property and did not see any such signs. Certainly if No Trespassing signs had been posted in 1973 and kept up for the subsequent fifteen years they would not have disappeared by the time Giordano inspected the property prior to the conveyance in 1987. It is highly unlikely that if Michael Giordano observed such signs on the property prior to his parents buying it, he would not have ignored the situation.
Considering all of the evidence on the subject, it cannot be found that plaintiff has proven his claim of adverse possession.
Accordingly, judgment is rendered for defendants on both CT Page 6870 counts of the complaint.
Joseph J. Purtill, Judge Trial Referee